**EXHIBIT 1**

## IN THE SUPERIOR COURT OF GWINNETT COUNTY

## STATE OF GEORGIA

**RIDGELINE CAPITAL PARTNERS, LLC**

_____

_____

**PLAINTIFF**

VS.

**MIDCAP FINANCIAL SERVICES, LLC**

_____

_____

. **DEFENDANT**

CIVIL ACTION NUMBER: *18A 01528-10*
_____

## SUMMONS

**TO THE ABOVE NAMED DEFENDANT:**

You are hereby summoned and required to file with the Clerk of said court and serve upon the Plaintiff's attorney, whose name and address is:

**Jeffrey D. Horst
One Atlantic Center, Suite 3250
1201 West Peachtree St. NW
Atlanta, GA 30309**

an answer to the complaint which is herewith served upon you, within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.

This **20th** day of **February**, 20**18**.

Richard T. Alexander, Jr.,
Clerk of Superior Court

By _____
Deputy Clerk

**INSTRUCTIONS:** Attach addendum sheet for additional parties if needed, make notation on this sheet if addendum sheet is used.

SC-1 Rev. 2011

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

FILED IN OFFICE
CLERK SUPERIOR COURT
GWINNETT COUNTY. GA
2018 FEB 20  PM 4: 20

RICHARD ALEXANDER. CLERK

| | | |
|---|---|---|
| RIDGELINE CAPITAL PARTNERS, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | CIVIL ACTION FILE NO. |
| MIDCAP FINANCIAL SERVICES, LLC, | ) ) ) | '18 A  0 15 28 - 10 |
| Defendant. | ) ) ) | |

## VERIFIED COMPLAINT

Plaintiff Ridgeline Capital Partners, LLC ("Plaintiff" or "Ridgeline") hereby files its Verified Complaint for specific performance, breach of contract, promissory estoppel, unjust enrichment, money had and received, breach of the duty of good faith and fair dealing, and attorneys' fees against Defendant MidCap Financial Services, LLC ("Defendant" or "MidCap"), and alleges as follows:

## PARTIES, JURISDICTION AND VENUE

1.

Ridgeline is a limited liability company organized under the laws of the State of Texas. Ridgeline acquires and sells commercial real estate including small medical office buildings.

1

## 2.

MidCap is a foreign limited liability company registered to do business in Georgia. MidCap may be served with the Summons and Complaint through its registered agent, C T Corporation System, at 289 S Culver St, Lawrenceville, Gwinnett County, GA 30046-4805.

## 3.

MidCap is a middle market focused specialty finance firm that provides senior debt solutions to companies across all industries. MidCap has over $15 billion of commitments under management. MidCap is managed by Apollo Capital Management GP, a subsidiary of Apollo Global Management, LLC. Apollo Global Management is one of the world's largest asset managers with approximately $242 billion of assets under management.

## 4.

This Court has personal jurisdiction over MidCap because it is a resident of Georgia. Subject matter jurisdiction of this matter is proper, and venue is proper pursuant to Ga. Const. Art. VI, § II, ¶¶ 3,6, and O.C.G.A. §§ 14-11-1108, 14-2-510.

## FACTS

### A.   MidCap Solicits Ridgeline To Purchase The Property

#### 5.

On or about July 28, 2017, MidCap, through its authorized agent Lawrence Brin ("Brin"), contacted Jeff Axley ("Axley"), the principal officer of Ridgeline, to solicit Ridgeline to purchase Governors Pavilion, a 45,331 sq. ft. medical office building located at 4450 Calibre Crossing NW, Acworth, Georgia (the "Property"). *See* Ex. A (legal description of the Property).

#### 6.

Brin sent Axley a Nondisclosure Agreement on July 28, 2017 to share information on the Property.

#### 7.

On July 31, 2017, Brin sent Axley an Argus file, rent roll, operating statement, and the appraisal from 2014.

#### 8.

The existing loan on the property was to mature in September 2017.

#### 9.

The then borrower (the "Defaulting Borrower") was not going to be able to satisfy the loan covenants needed to extend its loan.

3

10.

Initially, MidCap wanted Ridgeline to acquire the Property directly from the Defaulting Borrower for the outstanding loan amount.

11.

In September, MidCap assisted Ridgeline in preparing an offer to the Defaulting Borrower. But the Defaulting Borrower rejected this offer.

12.

MidCap's Brin then told Ridgeline's principal, Axley that unless the prior loan was repaid by the Defaulting Borrower, or the default under the prior loan was otherwise cured, MidCap would foreclose on the Property. MidCap would then sell the Property to Ridgeline for $5.7 million and provide $5 million financing for the purchase.

13.

MidCap indicated that it would seek a $50,000 good faith deposit from Ridgeline as a commitment for the agreement proposed by MidCap whereby it would sell the Property to Ridgeline and provide a $5,000,000 loan for the purchase.

4

14.

Before the foreclosure occurred, MidCap requested that Axley visit and
inspect the Property so Ridgeline would be ready to close on the purchase of the
Property as soon as MidCap foreclosed.

15.

Ridgeline complied, visiting the Property in October.  Ridgeline then
committed to MidCap to purchase the Property.

16.

In early October, MidCap forwarded all of the lease files, property condition
report, environmental report, and survey for the Property to Ridgeline. After
review of the information, Ridgeline reaffirmed its commitment to buy the
Property.

17.

Brin and MidCap's lawyers advised Ridgeline that nothing in writing would
be submitted to Ridgeline because MidCap did not want to appear as if it was
chilling the bidding at the foreclosure sale.

5

**B.**   **MidCap Forecloses And Reaffirms its Commitment To Sell The Property To Ridgeline**

18.

Ridgeline's principal Axley attended the foreclosure, but did not bid because he relied on the promises and previous commitment by MidCap to sell the Property to Ridgeline for $5.7 million and provide $5 million in financing for the purchase.

19.

At no time did MidCap tell Ridgeline it should bid at the auction.

20.

Consistent with what Brin told Axley MidCap would do, MidCap credit bid the amount of the debt at the foreclosure sale and foreclosed on November 7, 2017.

21.

Brin and Axley then had lunch after the foreclosure sale where Brin reaffirmed that MidCap would sell the Property to Ridgeline.  MidCap would finalize the documentation on the foreclosure and send a loan term sheet.

22.

The parties agreed that MidCap would sell the Property to Ridgeline at the previously agreed upon terms.

## C.     The Parties Sign A Binding Commitment For MidCap To Sell The Property To Ridgeline

23.

Two days after the foreclosure on November 9, 2017, MidCap sent its

commitment (the "Commitment") to Ridgeline. Ex. B. Ridgeline accepted on

November 13, 2017.

24.

MidCap drafted the terms of the Commitment and established the purchase

price for the Property at $5,637,962.00. Ex. B, p. 3.

25.

All material terms for the purchase of the Property and the financing were

finalized.

26.

As required by the Commitment, Ridgeline paid the $50,000 good faith

deposit.

27.

The Commitment specified all of the basic terms and conditions for the sale

of the Property by MidCap to Ridgeline.  It also provided a timetable of up to 105

days to close the transactions included in the Commitment.

7

28.

A conference call was held on November 14, 2017 to discuss the deal closing process. MidCap, its lawyers, and Ridgeline participated in the call.

29.

The only additional information MidCap wanted was some background on Ridgeline principals for purposes of the loan. No material terms regarding the purchase price or the loan were negotiated or changed.

30.

Communications later in November from MidCap indicated it was flexible on the closing date.

**D.    MidCap Reneges Because It Wants To Keep Enhanced Value For Itself**

31.

On or about December 7, 2017, Brin mentioned to Axley that MidCap might have to renege on its agreement to sell the Property to Ridgeline and provide the financing, because MidCap had received a very lucrative offer to lease all of the vacant space in the Property.

32.

This lease, if signed, would increase the value of the Property substantially, perhaps by 100% or more. Brin said MidCap was unwilling to leave that much value on the table.

8

33.

On or about December 7, 2017, Axley told Brin Ridgeline likely would file suit to enforce its right to purchase the Property. Brin said MidCap would reimburse Ridgeline for the good faith deposit, expenses incurred, and an additional amount to be determined.

34.

On January 12, 2018, Brin confirmed to Axley that MidCap would not go forward with the sale of the Property or the loan because of the lease offer and the resulting increased value of the Property.

35.

Brin told Axley MidCap would return Ridgeline's good faith deposit only if Ridgeline signed a release.

36.

On January 30, 2018, Ridgeline through its attorneys, confirmed that it was ready, willing, and able to close on the purchase of the Property either for cash or on the financing terms provided by MidCap in the Commitment. *See* Ex. C.

## COUNT I
## (SPECIFIC PERFORMANCE)

37.

Ridgeline restates and incorporates by reference all allegations contained in each of the paragraphs above as if set forth fully herein.

9

38.

This Court has exclusive jurisdiction over equity cases and cases involving title to land pursuant to Ga. Const. Art. IV, § IV, ¶ 1.

39.

This Court is authorized under O.C.G.A. § 23-2-130 to use its equitable powers to require specific performance of contracts whenever the damages recoverable at law would not be adequate compensation for nonperformance, including nonperformance of contracts for the purchase and sale of land.

40.

The Commitment is a contract for the sale of real property.

41.

The purchase price of $5,637,920 for the Property specified by MidCap and accepted by Ridgeline is adequate consideration for the sale of the Property.

42.

Ridgeline signed the Commitment for the Property on November 13, 2017, and paid a good faith deposit of $50.000.

43.

The Property is uniquely suited to Ridgeline's particular desired and intended use.

44.

In reliance upon the MidCap's Commitment and promises to sell the Property, Ridgeline stands ready, willing, and able to close on its purchase of the Property and to secure possession of the Property.

45.

Because of the inherently unique nature of real property, generally, and the Property, specifically, for the use intended by Ridgeline, damages for breach of contract will be insufficient to compensate Ridgeline, and Ridgeline will suffer irreparable harm if MidCap is not required to perform its obligations to close on the sale of the Property in accordance with the terms and conditions of the Agreement.

46.

MidCap has the capacity, power, and ability to take all steps necessary to honor its contractual obligations and to deliver title to the Property in exchange for Ridgeline's payment of the purchase price.

47.

Pursuant to O.C.G.A. § 23-2-130, Ridgeline is entitled to a decree of specific performance with a reasonable time to prepare for closing on a date certain no earlier than ten (10) days after entry of the decree.

11

## COUNT II
## (BREACH OF CONTRACT)

### 48.

Ridgeline restates and incorporates by reference all allegations contained in each of the paragraphs above as if set forth fully herein.

### 49.

MidCap confirmed through Brin on multiple occasions that MidCap would sell the Property to Ridgeline.

### 50.

The terms of the Commitment between Ridgeline and MidCap confirmed that Ridgeline would purchase the Property for $5,637,962.

### 51.

Ridgeline signed the Commitment and paid $50,000 good faith deposit.

### 52.

As a direct and proximate result of MidCap's breach of its contract, Ridgeline has sustained damages.

### 53.

To remedy MidCap's breach of contract, Ridgeline is entitled to damages, together with prejudgment and post-judgment interest as allowed by law and its costs of litigation, including reasonable attorneys' fees.

12

## COUNT III
## (PROMISSORY ESTOPPEL)

54.

Ridgeline restates and incorporates by reference all allegations contained in each of the paragraphs above as if set forth fully herein.

55.

MidCap promised to sell the Property to Ridgeline.

56.

Ridgeline relied on MidCap's representations regarding its promise to sell the Property.

57.

In reliance upon these representations, Ridgeline expended substantial effort and money in conducting due diligence. In further reliance it did not bid at the foreclosure auction, signed the Commitment, and paid the $50,000 good faith deposit.

58.

Ridgeline's reliance on MidCap's representations was reasonable.

59.

Ridgeline's reliance on MidCap's representations was to its detriment. Ridgeline has sustained damages as a direct and proximate rule of its reliance on these representations.

13

60.

Ridgeline is entitled to damages as awarded by a jury, together with

prejudgment and post-judgment interest as allowed by law and its costs of

litigation, including reasonable attorneys' fees.

## COUNT IV
## (UNJUST ENRICHMENT)

61.

Ridgeline restates and incorporates by reference all allegations contained in

each of the paragraphs above as if set forth fully herein.

62.

By failing to sell the property to Ridgeline, MidCap has been unjustly

enriched.

63.

It would be unjust for MidCap to retain the benefit it is receiving from

keeping the Property.

64.

Ridgeline is entitled to receive damages pursuant to O.C.G.A. § 9-2-7 plus

prejudgment and post-judgment interest and its costs of litigation, including

reasonable attorneys' fees.

14

## COUNT V
## (MONEY HAD AND RECEIVED)

### 65.

Ridgeline restates and incorporates by reference all allegations contained in each of the paragraphs above as if set forth fully herein.

### 66.

MidCap has received $50,000 and benefits that are the legitimate property of Ridgeline.

### 67.

MidCap is not entitled to those funds and benefits.

### 68.

Ridgeline has been damaged as a result of MidCap's refusal or failure to return or direct these funds and benefits to Ridgeline.

### 69.

Ridgeline is entitled to recover the funds received and retained by MidCap in an amount to be determined at trial.

## COUNT VI
## (BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING)

### 70.

Ridgeline restates and incorporates by reference all allegations contained in each of the paragraphs above as if set forth fully herein.

15

71.

The parties to every contract hold a duty to one another to exercise their obligations under the contract in good faith.

72.

MidCap failed to perform under its contract with Ridgeline in good faith, specifically, by refusing to perform its duty to sell the Property to Ridgeline and by keeping Ridgeline's good faith deposit.

73.

MidCap therefore violated its duty of good faith and fair dealing.

74.

As a direct and proximate cause of the breach, Ridgeline suffered damages in an amount to be proven at trial.

## COUNT VII
## (ATTORNEYS' FEES)

75.

Ridgeline restates and incorporates by reference all allegations contained in each of the paragraphs above as if set forth fully herein.

76.

MidCap has acted in bad faith, has been stubbornly litigious, and has caused Ridgeline unnecessary trouble and expense.

77.

Pursuant to O.C.G.A. § 13-6-11, Ridgeline is entitled to recover from MidCap its expenses of litigation, including, but not limited to, attorneys' fees.

WHEREFORE, Ridgeline demands that judgment be entered in its favor and against MidCap granting the following relief:

(a)     specific performance requiring MidCap to sell the Property to Ridgeline for $5,637,920 with a closing within 10 days of the Court's order;

(b)     judgment against MidCap for compensatory damages and prejudgment and post-judgment interest;

(c)     judgment against MidCap for all costs, expenses and attorneys' fees permitted by applicable law; and

(d)     such other and further relief as this Court deems just and appropriate.

Respectfully submitted this 20th day of February, 2018.

Jeffrey D. Horst
Georgia Bar No. 367834
Christopher E. Adams
Georgia Bar No. 789600
*Attorneys for Plaintiff*

KREVOLIN & HORST, LLC
One Atlantic Center, Suite 3250
1201 West Peachtree St., N.W.
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

17

## VERIFICATION

I, Jeff Axley, being first duly sworn under oath, personally appeared before the undersigned attesting officer duly authorized by law to administer oaths, do depose and say that I have reviewed the foregoing Verified Complaint and confirm that the allegations set forth therein are true and correct to the best of my knowledge, information and belief.

This _17_ day of February, 2018.

_____
Jeff Axley

Sworn to and subscribed before me
this ⎵⎵ day of February, 2018.

_____
Notary Public
My Commission Expires: _August 30, 2021_

NEKANE MIREN ALVAREZ
Commission # GG 100345
Expires August 30, 2021
Bonded Thru Budget Notary Services

KH475773.DOCX

# EXHIBIT

# A

## LEGAL DESCRIPTION

All that tract or parcel of land lying and being in Land Lots 37 & 40, 20th District, 2nd Section, Cobb County, Georgia, and being more particularly described as follows:

BEGINNING at a 3/4" open top pipe found at the corner common to Land Lots 36, 37, 40 & 41; thence along the easterly line of Land Lot 40 thence S 02°20'11" W a distance of 368.53 feet to an iron pin found with cap; thence leaving said Land Lot line S 63°57'59" W a distance of 340.18 feet to an iron pin found; thence S 24°29'58" E a distance of 212.32 feet to an iron pin found with cap; thence along a curve to the left, following the curvature thereof, for an arc distance of 97.45 feet, said curve having a radius of 125.00 feet and being subtended by a chord of S 46°54'38" E 95.00 feet to an iron pin found with cap on the northwesterly right of way of Old Acworth Dallas Hwy. (100 foot right of way); along said right of way, along a curve to the left following the curvature thereof, for an arc distance of 50.20 feet, said curve having a radius of 2,483.35 feet and being subtended by a chord of S 24°'16'42" W 50.20 feet to an iron pin found with cap; thence leaving said right of way along a curve to the right, following the curvature thereof, for an arc distance of 133.38 feet, said curve having a radius of 175.00 feet and being subtended by a chord of N 46°17'32" W 130.18 feet to an iron pin found with a cap; thence N 24°32'16" W a distance of 110.08 feet to an iron pin found with cap; thence N 63°10'25" E a distance of 24.92 feet to a nail found; thence N 24°32'25" W a distance of 101.00 feet to a nail found; thence S 64°04'23" W a distance of 25.06 feet to an iron pin found with cap; thence N 24°33'42" W a distance of 118.95 feet to a nail found; thence along a curve to the right, following the curvature thereof, for an arc distance of 105.19 feet, said curve having a radius of 1,025.00 feet and being subtended by a chord of N 21°40'20" W 105.15 feet to an iron pin found; thence N 56°13'03" E a distance of 2.13 feet to an iron pin found with cap; thence along a curve to the right, following the curvature thereof, for an arc distance of 195.37 feet, said curve having a radius of 1,025.00 feet and being subtended by a chord of N 13°46'57" W 195.08 feet to an iron pin found with cap; thence N 08°18'57" W a distance of 87.38 feet to an iron pin found with cap; thence along a curve to the left, following the curvature thereof, for an arc distance of 67.82 feet, said curve having a radius of 215.00 feet and being subtended by a chord of N 17°21'35" W 67.54 feet to an iron pin found with cap; thence N 26°27'40" W a distance of 145.26 feet to an iron pin set; thence N 76°51'29" W a distance of 22.88 feet to an iron pin set on the southerly right of way of Awtrey Church Road (right of way varies); thence along said right of way along a curve to the right, following the curvature thereof, for an arc distance of 68.95 feet, said curve having a radius of 891.02 feet and being subtended by a chord of N 52°31'44" E 68.93 feet to an iron pin set; thence leaving said right of way S 26°27'16" E a distance of 173.11 feet to an iron pin found with cap; thence along a curve to the right, following the curvature thereof, for an arc distance of 83.52 feet, said curve having a radius of 265.00 feet and being subtended by a chord of S 17°21'29" E 83.18 feet to an iron pin found with cap; thence S 07°08'59" E a distance of 14.03 feet to an iron pin found; thence N 63°42'12" E a distance of 277.23 feet to an iron pin found; thence S 26°38'04" E a distance of 64.22 feet to an iron pin found with cap on the northerly line of Land Lot 40; thence along said Land Lot line S 89°10'43" E a distance of 183.04 feet to the POINT OF BEGINNING. Said tract contains 237,595 square feet or 5.454 acres.

# EXHIBIT

# B



Lawrence Brin
Managing Director

MidCap Financial Services, LLC
7255 Woodmont Avenue
Suite 200
Bethesda, MD 20814
(301) 841-6484
lbrin@midcapfinancial.com

November 9, 2017

Mr. Jeff Axley
Ridgeline Capital Partners, LLC
8111 Preston Rd., Suite 430
Dallas, TX 75225

Re:  Governors Pavilion

Dear Jeff,

We are pleased to advise you that MidCap Financial Services, LLC ("MidCap Financial Services"), as servicer for MidCap Financial Trust or a to-be-determined affiliate ("MidCap Financial Funding"), will evaluate financing for the above referenced transaction (the "Loan"), under the terms and conditions set forth below with affiliates of Ridgeline Capital Partners, LLC ("Borrower") to refinance Borrower's existing indebtedness and to provide for Borrower's ongoing working capital requirements.

Please note that the terms and conditions set forth below are for discussion purposes only and do not imply in any way a commitment by any entity to approve or enter into a funding arrangement.  This is a non-binding term sheet; provided, however, that Borrower agrees to be bound by the provisions of this term sheet relating to confidentiality, exclusivity and expense reimbursement.  Funding under this proposal will only be made by MidCap Financial Funding upon legal documentation and credit approval by MidCap Financial Funding and its designated advisors, and all terms set forth herein are subject to such approvals and due diligence review.

| Borrower: | A to-be-formed or existing single purpose bankruptcy remote entity or entities acceptable to Agent. |
|---|---|
| Principal: | Ridgeline Capital Partners, LLC and Jeff Axley |
| Agent: | MidCap Financial Funding, or an affiliate. |
| Lenders: | MidCap Financial Funding, or an affiliate, together with such other lenders to which MidCap may syndicate the transaction. |
| Servicer: | MidCap Financial Services |
| Loan Amount: | The lesser of $6,500,000 or up to 75% of the as-stabilized appraised value of the Properties.  The Loan Amount shall be reduced on a dollar |

| | |
|---|---|
| | circumstances (e.g., bankruptcy, prohibited transfers or liens, etc.) and other standard obligations with respect to the Principals. |

| Sources and Uses: | |  |  |  |
|---|---|---|---|---|
| | **SOURCES** | | **USES** | |
| | Initial Funding | $5,000,000 | Purchase Price | $5,637,962 |
| | TI/LC Holdback | $1,250,000 | TI/LC Holdback | $1,250,000 |
| | Interest Holdback | $250,000 | Interest Holdback | $250,000 |
| | Equity | $778,092 | Ridgeline Acquisition Fee | $56,380 |
| | | | Legal and Due Diligence | $35,000 |
| | | | Origination Fee | $48,750 |
| | Total | $7,278,092 | Total | $7,278,092 |

| | |
|---|---|
| Term: | 36 months. Borrower shall have two consecutive 12 month extension options, each subject to the following: (i) 0.35% fee based on full Loan Amount, (ii) 9.0% Debt Yield on historical and pro forma prospective basis, and (iii) no default or event of default. |
| Base Index Rate: | Reserve adjusted 30-day LIBOR index, reset monthly, subject to a floor of 100 basis points. Interest shall be calculated based upon the actual number of days elapsed in a 360 day year. |
| Spread: | 485 basis points. |
| Interest Rate Protection: | Agent shall have the right to require the Borrower to purchase an interest rate cap for the initial Term of the Loan. |
| Amortization: | Interest only; beginning in Month 36, the Loan shall amortize based on a 30-year real estate style schedule. |
| Prepayment: | The Loan shall subject to yield maintenance during the first 18 months. Thereafter, the Loan may be paid off at any time without penalty. |
| Origination Fee: | 0.75% of the Loan Amount. The Origination Fee is earned upon approval of the Loan and is payable to Agent upon the closing of the Loan. |
| Exit Fee: | 0.75% of the Loan Amount. |
| Lease Payments: | Lease Payments shall be paid into an account subject to an account control agreement in favor of the Agent. |
| Lease Security Deposit: | Lease Security Deposits shall be maintained in an account subject to an account control agreement in favor of the Agent. |
| Tenanting: | Any new leases or subleases shall be subject to review and approval of Agent, outside of certain to-be-defined parameters. |

| | |
|---|---|
| **Property Management:** | Transwestern or another management company acceptable to Agent shall manage the Property. Each management agreement shall be in substance and form acceptable to Agent. Agent shall have the absolute right to approve any proposed change to the management company or any management agreement. The management agreement and fees shall be subordinated to the Loan. |
| **Brokers:** | Agent and Lenders shall not be responsible for any claims for brokerage fees. |
| **Syndication/Cooperation:** | The Loan is not conditioned on a syndication. However, Borrower and Principal shall cooperate with Agent prior to and following closing relating to any efforts toward syndication of the Loan, if applicable, which may include (i) separating the Loan into two or more notes secured by one or more insured mortgages (with tiered priorities as determined by Agent); (ii) amending the Loan, provided that the effect of which would not materially increase Borrower's or any Principal's obligations or decrease Borrower's or any Principal's rights under the loan documents and (iii) providing legal opinions and other information necessary for Agent to make the Loan marketable.<br><br>Agent may elect to share its diligence in an effort to minimize the costs of other institutions and Borrower and Principal hereby consent to all such sharing. Borrower agrees to discuss cash management and banking relationships with potential syndicate banks. |
| **Due Diligence:** | Agent shall perform its standard due diligence in order to prepare its internal credit memorandum as it seeks approval to close the Loan. As part of its standard due diligence, Agent shall require third party reports including, but not limited to, a FIRREA appraisal, an ALTA land title survey, a mortgage title insurance commitment and policy, lien, litigation and judgment searches, property condition report, environmental report, seismic assessment, flood plain assessment, zoning report, insurance assessment and credit and background reviews of the Borrower and Principal. |
| **Costs & Deposits:** | Borrower and Principal shall be responsible for and shall pay promptly upon demand (i) all fees, costs and expenses of the Agent and Lenders (including without limitation the fees, costs and expenses of counsel to, and independent appraisers, consultants and auditors retained by, the Agent and Lenders ) in connection with the examination, review, due diligence investigation, documentation, negotiation, recording, title insurance, closing and syndication of the transactions contemplated by or in connection with the Loan.<br><br>Borrower and Principal shall remit to Agent upon execution of this term sheet an expense deposit in the amount of $50,000. Borrower and Principal agree to remit, upon request by Agent, additional deposit funds to be applied against costs during the Loan underwriting and diligence period. Borrower and Principal agree that deposits made |

without prior written consent, except for management and regulatory bodies on a need-to-know basis. All persons who are informed of the contents of this term sheet also need to be informed that such contents are confidential and cannot be disclosed without Administrative Agent's prior written consent.

This term sheet supersedes all previous discussions, communications and proposals relating in any way to the Facility and shall expire if not executed by Borrower and returned to MidCap Financial Services by 5:00pm EST on November 16, 2017.

MidCap Financial Services, on behalf of MidCap Financial Funding, hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act") and normal policies and practices, MidCap Financial Services is required, on behalf of MidCap Financial Funding, to obtain, verify and record certain information and documentation that identifies each Borrower, which information includes the name and address of each Borrower and such other information that will allow MidCap Financial Funding to identify each Borrower in accordance with the Act.

If you would like MidCap Financial Services to continue reviewing your loan request, please evidence your agreement with the forgoing by accepting this proposal on the space set forth below, and returning it, along with a good faith deposit of $50,000, to MidCap Financial Services, LLC, Attn: Finance & Accounting/Good Faith Department, 7255 Woodmont Ave., Suite 200, Bethesda, MD 20814. Alternatively, the good faith deposit can be wired to SunTrust Bank, 25 Park Place, Atlanta, GA 30303; ABA # 061000104, Account Name: MidCap Financial Services, LLC, ACCT# 1000113400435, ATTN: Ridgeline.

Upon receipt, we will immediately begin due diligence, MidCap Financial Funding's credit process and legal documentation. We appreciate the opportunity to furnish this proposal to you. If you have any questions, please do not hesitate to call.

Sincerely,

**MidCap Financial Services, LLC**

Lawrence Brin
Managing Director
*[sent via email]*

Agreed and accepted this ___ day of _____, 20__.

_____
**RIDGELINE CAPITAL PARTNERS, LLC**

By:_____
Name:_____
Title:_____

# EXHIBIT

# C



Jeffrey D. Horst

**KREVOLIN | HORST** LLC

www.khlawfirm.com

Direct Dial: (404) 888-9594
horst@khlawfirm.com

January 30, 2018

**VIA EMAIL (mleffler@vedderprice.com)**
**AND FEDERAL EXPRESS**
Mr. Lawrence Brin
MidCap Financial Services, LLC
c/o Matthew R. Leffler, Esq.
Vedder Price
222 North LaSalle Street
Chicago, IL  60601

Re:     Agreements reached by MidCap Financial Services, LLC ("MidCap") with
        Ridgeline Capital Partners, LLC ("Ridgeline") for the sale of Governors Pavilion,
        a 45,331 square foot medical office building located at 4450 Calibre Crossing,
        NW, Acworth, Georgia (the "Property"), and for providing the acquisition
        financing

Dear Mr. Brin:

        This firm represents Ridgeline in connection with the above matter.  MidCap solicited Ridgeline to
purchase the Property with financing from MidCap.  Ridgeline agreed to purchase the Property confirmed
in a November 9, 2017 Letter Agreement between MidCap and Ridgeline.  Ridgeline accepted on
November 13, 2017 (the "Commitment").  Ridgeline paid - and MidCap accepted - $50,000.00 as a good
faith payment.

        You have now told Ridgeline that MidCap intends to renege on its promises and obligations to
Ridgeline and withdraw from the Commitment.  Ridgeline hereby confirms that it has and will continue to
comply with the Commitment as it relates to the purchase of the Property.  Further, Ridgeline intends to
exercise all of its rights and remedies if MidCap refuses to close the transaction to sell the Property to
Ridgeline.

**MidCap Solicits Ridgeline To Purchase The Property**.

        On or about July 28, 2017, you contacted Jeff Axley, the principal officer of Ridgeline, to solicit
Ridgeline to acquire the Property.  The existing loan was to mature in September 2017.  The then borrower
(the "Defaulting Borrower") was not going to be able to satisfy the loan covenants needed to extend its
loan.

        Initially, MidCap wanted Ridgeline to acquire the Property directly from the Defaulting Borrower
for the outstanding loan amount.  In September, MidCap assisted Ridgeline in preparing an offer to the
Defaulting Borrower.  But the Defaulting Borrower rejected this offer.  MidCap then told Ridgeline that
unless the prior loan was repaid by the Defaulting Borrower, or the default under the prior loan was

KH473175.DOCX 2

Mr. Lawrence Brin
January 30, 2018
Page 2

otherwise cured, MidCap would foreclose on the Property.  MidCap would then sell the Property to Ridgeline for $5.7 million and provide $5 million financing for the purchase.  MidCap wanted a $50,000.00 deposit from Ridgeline as a commitment for the agreements between MidCap and Ridgeline for the purchase and loan.

Before the foreclosure occurred, MidCap requested that Ridgeline's principal, Jeff Axley, visit and inspect the Property so Ridgeline would be ready to close on the purchase of the Property as soon as MidCap foreclosed.  Ridgeline complied, visiting the Property in September.  Ridgeline then committed to MidCap to purchase the Property.  In early October, MidCap forwarded all the lease files for the Property to Ridgeline.  You and MidCap's lawyers advised Ridgeline that nothing in writing would be submitted to Ridgeline because MidCap did not want to appear as if it was chilling the bidding at the foreclosure sale.

## MidCap Forecloses And Reaffirms its Commitment To Sell The Property To Ridgeline.

Ridgeline's principal attended the foreclosure, but did not bid because of the previous commitment by MidCap to sell the Property to Ridgeline for $5.7 million and provide $5 million in financing.  MidCap foreclosed on November 7, 2017.  You and Jeff Axley then met where you reaffirmed that MidCap would sell the Property to Ridgeline.  MidCap would finalize the documentation on the foreclosure and send a loan term sheet.  The parties agreed that MidCap would sell the Property to Ridgeline at the previously agreed upon terms.

## The Parties Sign a Binding Commitment For MidCap To Sell The Property To Ridgeline.

MidCap's Commitment was offered to Ridgeline and accepted on November 13, 2017 in the week following the foreclosure sale.  MidCap drafted the terms of the Commitment and established the purchase price for the Property at $5,637,962.00.  When the loan from MidCap was closed, additional monies would be paid for escrow holdbacks and other fees and costs.  All material terms for the purchase of the Property and the financing were finalized.

As required by the Commitment, Ridgeline made the requisite $50,000.00 good faith deposit.  The Commitment provided for all of the basic terms and conditions for the sale of the Property by MidCap to Ridgeline.  It also provided a timetable of up to 105 days in connection with the transactions included in the Commitment.

There was a conference call on November 14, 2017 to discuss the deal closing process.  MidCap, its lawyers, and Ridgeline participated in the call.  The only additional information MidCap wanted was some background on Ridgeline principals for purposes of the loan.  No material terms regarding the purchase price or the loan were negotiated or changed.  Communications later in November from MidCap indicated it was flexible on the closing date.

## MidCap Reneges Because It Wants To Keep Enhanced Value For Itself.

On December 6, 2017, you mentioned the possibility that MidCap might have to renege on its agreement to sell the Property to Ridgeline and provide the financing, because MidCap had received a very lucrative offer to lease all of the vacant space in the Property.  This lease, if signed, would increase the value of the Property substantially, perhaps by 100% or more.  You said MidCap was unwilling to leave that much value on the table.  On January 12, 2018, you confirmed to Jeff Axley of Ridgeline that MidCap would not go forward with the sale of the Property or the loan because of the lease offer and the resulting increased value of the Property.

KH473175.DOCX 2

Mr. Lawrence Brin
January 30, 2018
Page 3

**MidCap Must Sell The Property To Ridgeline.**

    Ridgeline hopes and expects that MidCap will reconsider and retract its stated intention and honor its obligations under its promises and agreements with Ridgeline. Ridgeline relied upon all of the assurances and representations provided by you and MidCap as has been expressly provided in the Commitment and otherwise and wishes to exercise its right to purchase the Property. You are hereby notified that Ridgeline is, and remains ready, willing and able to purchase the Property in accordance with the terms set forth in the Commitment. The purchase price will be the $5,637,962.00 price specified by MidCap in the Commitment.

    Ridgeline recognizes the Commitment contains boilerplate disclaimer language about whether MidCap's financing obligation is conditioned upon further paperwork being signed. But these boilerplate disclaimers are not material to the transaction. More importantly, none of the boilerplate terms affect MidCap's obligation to sell the Property to Ridgeline. There are no conditions to MidCap's obligation to sell the Property. Ridgeline is prepared to purchase the Property with or without financing from MidCap.

**Additional Rights And Remedies.**

    In addition to Ridgeline's rights arising from MidCap's promises and its obligations under the Commitment and related agreements to purchase the Property, Ridgeline has additional rights and remedies under applicable Georgia law to seek damages from MidCap if it refuses to sell the Property to Ridgeline. Ridgeline expressly reserves all its rights and remedies against MidCap. Please confirm MidCap's willingness to comply with the obligations under the Commitment within ten (10) days following the date of this letter. Otherwise, Ridgeline will have no alternative except to institute litigation against MidCap to enforce MidCap's obligation to sell the Property to Ridgeline.

                                        Very truly yours,

                                        Jeff D. Horst

JDH/mg
cc (via email):        Mr. Jeff Axley
                    Mr. Stephen A. Grove
                    William H. Ferguson, Esq.

18A 07528-10

## General Civil and Domestic Relations Case Filing Information Form

☑ Superior or ☐ State Court of <u>Gwinnett</u>_____ County

| For Clerk Use Only | |
|---|---|
| Date Filed _____ | Case Number _____ |
| MM-DD-YYYY | |

| Plaintiff(s) | | | | | Defendant(s) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ridgeline Capital Partners, LLC | | | | | MidCap Financial Services, LLC | | | | |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix. | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix | Last | First | Middle I. | Suffix | Prefix |

Plaintiff's Attorney <u>Jeffrey D. Horst</u>_____   Bar Number <u>367834</u>_____   Self-Represented ☐

### Check One Case Type in One Box

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☑ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☑ Real Property
- ☐ Restraining Petition
- ☐ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Family Violence Petition
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

**Post-Judgment – Check One Case Type**
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Modification
- ☐ Other/Administrative

FILED IN OFFICE
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA
2018 FEB 20 PM 4:20
RICHARD ALEXANDER, CLERK

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____   _____
Case Number       Case Number

☑ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is an interpreter needed in this case? If so, provide the language(s) required. _____
Language(s) Required

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

_____
_____

Version 1.1.18

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | |
|---|---|
| **RIDGELINE CAPITAL PARTNERS, LLC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **CIVIL ACTION FILE NO.** |
| **v.** ) | |
| ) | _____ |
| **MIDCAP FINANCIAL SERVICES, LLC,** ) | |
| ) | |
| **Defendant.** ) | |

## PLAINTIFF RIDGELINE CAPITAL PARTNERS, LLC'S FIRST REQUEST FOR ADMISSIONS TO DEFENDANT MIDCAP FINANCIAL SERVICES, LLC

Pursuant to O.C.G.A. § 9-11-36, Plaintiff Ridgeline Capital Partners, LLC ("Ridgeline") hereby propounds its First Requests for Admission to Defendant MidCap Financial Services, LLC ("MidCap"). Ridgeline requests that MidCap respond to these Requests fully, in writing, and under oath, within the time prescribed by Georgia Law.

## DEFINITIONS AND INSTRUCTIONS

Ridgeline incorporates by reference the definitions and instructions contained in their First Interrogatories to MidCap as though fully set forth in these Requests.

## REQUESTS FOR ADMISSION

1.

Lawrence Brin ("Brin") is an authorized agent of MidCap.

2.

Brin has the authority to bind MidCap.

3.

On or about July 28, 2017, Brin contacted Jeff Axley ("Axley).

4.

Brin asked Axley if Ridgeline would purchase Governors Pavilion, a 45,331 sq. ft. medical office building located at 4450 Calibre Crossing NW, Acworth, Georgia (the "Property").

5.

Brin has the authority to commit to sell the Property to Ridgeline.

6.

Ex. A is a true and accurate copy of the legal description of the Property.

7.

Brin sent Axley a Nondisclosure Agreement on July 28, 2017 to share information on the Property.

8.

On or about July 31, 2017, Brin sent Axley an Argus file, rent roll, operating statement, and the appraisal from 2014.

9.

The existing loan on the Property was to mature in September 2017.

10.

Brin told Axley the then borrower (the "Defaulting Borrower") was not going to be able to satisfy the loan covenants needed to extend its loan.

11.

MidCap wanted Ridgeline to acquire the Property directly from the Defaulting Borrower for the outstanding loan amount.

12.

In September 2017, MidCap assisted Ridgeline in preparing an offer to the Defaulting Borrower.

13.

The Defaulting Borrower rejected this offer from Ridgeline that MidCap had helped draft.

14.

Brin then told Axley that unless the prior loan was repaid by the Defaulting

Borrower, or the default under the prior loan was otherwise cured, MidCap would

foreclose on the Property.

15.

Brin told Axley if MidCap foreclosed, MidCap would sell the Property to

Ridgeline for $5.7 million and provide $5 million financing for the purchase.

16.

MidCap told Ridgeline it would seek a $50,000 good faith deposit from

Ridgeline as a commitment for the agreement by MidCap to sell the Property to

Ridgeline and provide a $5,000,000 loan for the purchase.

17.

Before the foreclosure occurred, MidCap requested that Axley visit and

inspect the Property so Ridgeline would be ready to close on the purchase of the

Property as soon as MidCap foreclosed.

18.

Axley complied, visiting the Property in September 2017.

19.

Ridgeline committed to MidCap to purchase the Property after visiting the

Property.

20.

In early October 2017, MidCap forwarded all of the lease files, property condition report, environmental report, and survey for the Property to Ridgeline.

21.

After receiving this information, Ridgeline reaffirmed its commitment to MidCap to buy the Property.

22.

Brin and MidCap's lawyers told Ridgeline that nothing in writing would be submitted to Ridgeline because MidCap did not want to appear as if it was chilling the bidding at the foreclosure sale.

23.

At no time before the foreclosure did MidCap tell Ridgeline it could not rely on the promises and previous commitment by MidCap to sell the Property to Ridgeline for $5.7 million and provide $5 million in financing for the purchase.

24.

At no time did MidCap tell Ridgeline it should bid at the foreclosure.

25.

Brin told Axley MidCap would credit bid the amount of the debt at the foreclosure.

26.

MidCap foreclosed on November 7, 2017.

27.

Brin and Axley had lunch after the foreclosure on November 7, 2017.

28.

At the lunch after the foreclosure, Brin reaffirmed that MidCap would sell the Property to Ridgeline.

29.

Brin also told Axley that MidCap would finalize the documentation on the foreclosure and send a loan term sheet.

30.

The parties agreed that MidCap would sell the Property to Ridgeline at the previously agreed upon terms.

31.

Two days after the foreclosure on November 9, 2017, MidCap sent its commitment (the "Commitment") to Ridgeline.

32.

Ex. B. is a true and accurate copy of the Commitment MidCap sent to Ridgeline on November 9, 2017.

33.

Ridgeline accepted and signed the Commitment on November 13, 2017.

34.

MidCap drafted the terms of the Commitment.

35.

In the Commitment, MidCap established the purchase price for the Property at $5,637,962.00.

36.

All material terms for the purchase of the Property and the financing were finalized.

37.

As required by the Commitment, Ridgeline paid the $50,000 good faith deposit.

38.

The Commitment specified all of the basic terms and conditions for the sale of the Property by MidCap to Ridgeline.

39.

The Commitment also provided a timetable of up to 105 days to close the transactions in the Commitment.

40.

A conference call was held on November 14, 2017 to discuss the deal closing process.

41.

MidCap, its lawyers, and Ridgeline participated in the call.

42.

During the call, the only additional information MidCap said it wanted was some background on Ridgeline principals for purposes of the loan.

43.

No material terms regarding the purchase price or the loan were negotiated or changed during the conference call or thereafter.

44.

Later in November 2017, MidCap indicated it was flexible on the closing date.

45.

On or about December 7, 2017, Brin told Axley that MidCap might have to renege on its agreement to sell the Property to Ridgeline and provide the financing, because MidCap had received a lucrative offer to lease all of the vacant space in the Property.

46.

Brin told Axley the lease, if signed, would increase the value of the Property substantially, perhaps by 100% or more.

47.

Brin told Axley MidCap was unwilling to leave that much value on the table.

48.

On or about December 7, 2017, Axley told Brin Ridgeline likely would file suit to enforce its right to purchase the Property.

49.

Brin told Axley MidCap would reimburse Ridgeline for the good faith deposit, expenses incurred, and an additional amount to be determined.

50.

On January 12, 2018, Brin confirmed to Axley that MidCap would not go forward with the sale of the Property or the loan because of the lease offer and the resulting increased value of the Property.

51.

Brin told Axley MidCap would return Ridgeline's good faith deposit if Ridgeline signed a release.

52.

On January 30, 2018, Ridgeline, through its attorneys, confirmed that it was ready, willing, and able to close on the purchase of the Property either for cash or on the financing terms provided by MidCap in the Commitment.

53.

The Commitment is a contract for the sale of real property.

54.

The purchase price of $5,637,920 for the Property specified by MidCap in the Commitment and accepted by Ridgeline is adequate consideration for the sale of the Property.

55.

Ridgeline signed the Commitment for the Property on November 13, 2017 and paid good faith deposit of $50,000.

56.

MidCap has the capacity, power, and ability to take all steps necessary to honor its contractual obligations and to deliver title to the Property in exchange for Ridgeline's payment of the purchase price.

57.

MidCap confirmed through Brin on multiple occasions that MidCap would sell the Property to Ridgeline.

58.

The terms of the Commitment between Ridgeline and MidCap confirmed that Ridgeline would purchase the Property for $5,637,962.

59.

MidCap agrees that Ridgeline has sustained damages arising from MidCap not selling the Property to Ridgeline.

60.

Ridgeline is entitled to damages, together with prejudgment and post-judgment interest as allowed by law and its cost of litigation, including reasonable attorneys' fees.

61.

MidCap knew Ridgeline was relying on MidCap's representations regarding its promise to sell the Property to Ridgeline.

62.

MidCap knew Ridgeline expended substantial effort and money in conducting due diligence and preparing to purchase the Property.

63.

MidCap has offered to pay Ridgeline for its due diligence expenses.

64.

By not selling the Property to Ridgeline, MidCap's financial position has been improved.

65.

MidCap has received $50,000 and benefits that are the legitimate property of Ridgeline.

66.

MidCap is not entitled to those funds and benefits.

67.

Ridgeline has been damaged as a result of MidCap's refusal or failure to return or direct these funds and benefits to Ridgeline.

68.

MidCap has acted in bad faith, has been stubbornly litigious, and has caused Ridgeline unnecessary trouble and expense.

69.

Ridgeline is entitled to recover from MidCap its expenses of litigation, including, but not limited to, attorneys' fees.

Respectfully submitted this 21st day of February, 2018.

_____
Jeffrey D. Horst
Georgia Bar No. 367834
Christopher E. Adams
Georgia Bar No. 789600
*Attorneys for Plaintiff*

KREVOLIN & HORST, LLC
One Atlantic Center, Suite 3250
1201 West Peachtree St., N.W.
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the within and foregoing *Plaintiff Ridgeline Capital Partners, LLC's First Request for Admissions to Defendant Midcap Financial Services, LLC* were served on Defendant via courier to insure hand delivery to:

MidCap Financial Services, LLC
c/o C T CORPORATION SYSTEM
289 S Culver St.
Lawrenceville, GA 30046-4805

This 21st day of February, 2018.

KREVOLIN & HORST, LLC

Jeffrey D. Horst
Georgia Bar No. 367834
Christopher E. Adams
Georgia Bar No. 789600
*Attorneys for Plaintiff*

1201 W. Peachtree Street, N.W.,
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| RIDGELINE CAPITAL PARTNERS,<br>LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION FILE NO. |
| v. | ) | |
| | ) | _____ |
| MIDCAP FINANCIAL SERVICES,<br>LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### PLAINTIFF RIDGELINE CAPITAL PARTNERS, LLC'S  FIRST INTERROGATORIES TO DEFENDANT MIDCAP FINANCIAL SERVICES, LLC

Pursuant to O.C.G.A. §§ 9-11-26 and 9-11-33 Plaintiff Ridgeline Capital

Partners, LLC ("Ridgeline") hereby propounds its First Interrogatories

("Interrogatories") to Defendant MidCap Financial Services, LLC ("MidCap").

These Interrogatories are to be answered in writing under oath within the

applicable time period prescribed by Georgia law.

### DEFINITIONS

(a)    Plaintiff or Ridgeline  – As used herein, "Plaintiff" or "Ridgeline"

shall refer to Ridgeline Capital Partners, LLC and all of its parents, subsidiaries,

affiliated entities, directors, officers, members, managers, agents, employees,

representatives, independent contractors, and attorneys.

    (b)    <u>Defendant or MidCap</u> – As used herein, "Defendant" or "MidCap" refers to MidCap Financial Services, LLC, all of its parents, subsidiaries or affiliated entities, including, but not limited to Apollo Global Management, LLC, and all directors, officers, members, managers, agents, employees, representatives, independent contractors, and attorneys.

    (c)    <u>Document/Records</u> - As used herein, the word "document(s)" or "record(s)" is intended to include and shall include, without limitation and in the singular as well as in the plural, any stored or retained data or information in any form, including but not limited to hard copies, digital, electronic or magnetic retained information.  Such documents include and are not limited to drafts and final versions of all memoranda (including written memoranda of telephone conversations, other oral communications, discussions, agreements, acts and activities), letters, postcards, telegrams, intra-office and inter-office communications, pamphlets, diaries, records of every kind, email, email attachments, computer diskettes, CD ROMs, internal or external hard drives, computer tapes, sound recordings, transcripts of sound recordings, contracts, books, reports, catalogs, price lists, financial statements, books of account, journals, ledgers, purchase orders, invoices, indices, computer programs and data, data files, tapes, correspondence, document changes not saved, documents created not saved, instant messages-sent and received, metadata, internet service provider

emails, voice mail messages/deleted voice messages, folder name/file directory, master file table, images-including all website images visited, all website visiting activities-including elapsed time while viewing each site, spreadsheets, database files, financial records including tax and accounting information, faxes sent and received, files access history from company servers and/or internet, contact lists, outlook calendar appointments, PDA synchronized data, history of internet searches by search criteria, blogs, company records, inventory of all external hardware devices connected to computers (*e.g.*, external media devices, printers, backup systems, jump drives, etc.), inventory of all software applications installed on the computers, deleted data files, photographs, microfilm, bulletins, circulars, notices, surveys, minutes, instructions, canceled checks, calendars, drawings, diagrams, sketches, and writings of every kind and character, including preliminary drafts and other copies of the foregoing, however produced or reproduced.

(d)     Person – As used herein, "person" shall mean a natural person or an artificial person, including partnerships, corporations, proprietorships, unincorporated associations, limited liability entities, governmental bodies, or any other legally cognizable entities.

(e)     Date – As used herein, "date" shall mean the exact day, month, and year, if known to the respondent, or, if the exact date is not known, the best available approximation.

(f)   Communication – As used herein, "Communication" refers to any manner or form of information, memoranda, notes or message transmission, however produced or reproduced, whether by "document," as herein defined or orally or otherwise, which is made by you or others or which is distributed or circulated between or among persons, or data storage or processing units including computer data storage and processing units, and any and all documents containing, consisting of, or relating or referring, in any way, either directly or indirectly to, a communication.

(g)   State all facts – As used herein, the term "state all facts" shall mean to state all facts discoverable under O.C.G.A. §§ 9-11-26 and 9-11-33 known to MidCap or MidCap's attorney, and to identify all persons having knowledge of such facts, identify all documents concerning or relating to such facts, and identify all communications concerning or relating to such facts.  When used in reference to any allegation of the pleadings, "state all facts" shall include all facts negating, as well as supporting the allegation.

(h)   Identify and give the identity of – As used herein, "identify" or to give the "identity of" when used in reference to:

(1)   A person who is an individual, shall mean to state its or her full name, present or last known residence address (designating which), and present or

KH475895.DOCX 4                                     4

last known position or business affiliation (designating which), job title,

employment address, and business and residence telephone numbers;

(2)    A person who is a <u>firm, partnership, corporation, proprietorship,</u>

<u>association, financial institution, or other organization or entity</u>, shall mean

to state its full name and present or last known address and telephone

number (designating which), the legal form of such entity or organization,

and the identity of its chief executive officer;

(3)    A <u>document</u> shall mean to state the title (if any), the date, author,

sender, recipient, the identity of persons signing it, type of document (i.e.,

letter, memorandum, book, telegram, invoice, etc.) or some other more

particular means of identifying it if known (*e.g.*, invoice number), the names

of the persons known to have seen the document or to have received copies,

its present location or custodian, and a description of its contents (in lieu of

stating the foregoing information, MidCap may attach a legible copy of a

document to the responses hereto, specifying the particular Interrogatory to

which the copy is in response and identifying the present custodian of the

original); and

(4)    An <u>oral communication</u> shall mean to state the date, subject matter,

communicator, communicatee, nature of communication, place or places

where the communication occurred, whether it was recorded or otherwise memorialized, and identity of any witnesses thereto.

(i)     Relating to – As used herein, the term "relating to" shall mean having any relationship or connection to, concerning, being connected to, commenting on, responding to, containing, evidencing, showing, memorializing, describing, analyzing, reflecting, pertaining to, comprising, constituting, or otherwise establishing any reasonable, logical, or causal connection.

(j)     Complaint – As used herein, "Complaint" shall refer to the Complaint filed by Ridgeline Capital Partners, LLC in the above-styled case.

(k)     You or Your - As used herein, "you" or "your" refers to the Defendant as defined herein.

(l)     Commitment - As used herein, the "Commitment" refers to the November 9, 2017 letter from MidCap to Ridgeline which was signed and accepted by Ridgeline on November 13, 2017.

(m)     Property – As used herein, the "Property" refers to Governors Pavilion, a 45,331 sq. ft. medical office building located at 4450 Calibre Crossing NW, Acworth, Georgia.

(n)     Defaulting Borrower – As used herein, the "Defaulting Borrower" refers to the owner of the Property prior to the November 7, 2017 foreclosure.

(o)    Answer – As used herein, "Answer" shall refer to the Answer filed by MidCap Financial Services, LLC in response to the Complaint in the above-styled case.

## INSTRUCTIONS

(a)    Please reproduce each Interrogatory and set forth the answer to each Interrogatory separately.  When these Interrogatories contain separately numbered or lettered paragraphs, each separately numbered or lettered paragraph should be treated separately and a separate response furnished.

(b)    Objections Based on Privilege – In the event that any answers or identification of any documents requested herein are withheld under a claim of privilege, please provide the following information with respect to each such answer or document:

(1)    The type of document, its general subject matter, and the place and approximate date it was prepared or created;

(2)    The name and title of each person who prepared or created the document or who has knowledge of the answer, and the name and title of each other person who has received or examined the document or a copy thereof;

(3)    A statement of the circumstances which bear on whether or not the claim of privilege is appropriate and whether the privilege that is claimed

should extend to the entire answer or document or to part of the answer or document; and

(4)     The number of each Interrogatory to which the answer or document otherwise would be responsive.

(c)     To the extent any information called for by these Interrogatories is unknown to MidCap, so state, and set forth such remaining information as is known.  If any estimate can reasonably be made in place of unknown information, also set forth MidCap's best estimate, clearly designated as such, in place of unknown information, and describe the basis upon which the estimate is made.

(d)     <u>Documents No Longer in MidCap's Possession</u> – If any document which MidCap would have produced in response to any Interrogatory was, but is no longer, in MidCap's present possession or subject to MidCap's control or is no longer in existence, please state whether any such document is:

(1)     missing or lost;

(2)     destroyed;

(3)     transferred to others; or

(4)     otherwise disposed of, and in any such instance, set forth the surrounding circumstances of any authorization for such disposition and state the approximate date of any such disposition, and, if known, state also the present location and custodian of such document.

(e)     These Interrogatories shall be deemed continuing, so as to require additional answers if further information is obtained between the time the answers are served and the time of the trial.  Such additional answers shall be served from time to time, but not later than seven (7) days after such additional information is received or ten (10) days prior to hearing or a trial of tits action, whichever period is sooner.

(f)     Should it be more convenient to produce copies of relevant documents instead of identifying and stating the contents of those documents when that is requested, MidCap may produce true and correct copies of any such documents, including drafts of other variations therefrom, in lieu of supplying the identification requested above, arranged and labeled separately for each answer to which they relate.

(g)     Unless otherwise noted, the applicable time period for these Interrogatories is January 1, 2017 to the date of your responses.

## **INTERROGATORIES**

1.

Identify each person participating in the preparation of responses to these Interrogatories or providing any information to be used in the response.

2.

Identify all persons whom you know or have any reason to believe have any knowledge about the allegations in Ridgeline's Complaint or MidCap's Answer and Defenses, and with respect to each individual, identify the basis of their knowledge.

3.

Identify each person whom you expect to call as an expert witness at the trial in this case, and for each person:

(a)     identify the subject matter and opinions to which the expert is expected to testify; and

(b)     state all facts upon which such opinions are based.

4.

Identify all persons with whom MidCap has had any communications about the Property, Ridgeline's claims and/or Complaint, MidCap's Answer or Defenses, or the subject matter of this lawsuit, and for each person so identified, state:

(a)     the dates of any communications;

(b)     the subject matter or purpose of any communications;

(c)     all persons whom you know or have any reason to believe have any knowledge relating to the information provided in subparagraphs (a) and (b); and

(d)     all documents evidencing, reflecting, or referring to any information

provided in response to subparagraphs (a)–(c).

5.

Identify each person who has knowledge or information of any facts or

circumstances about the following:

(a)     the negotiation or consummation of any agreement between Ridgeline

and MidCap, including, but not limited to, the Commitment;

(b)     Ridgeline and MidCap's performance under the Commitment;

(c)     MidCap's decision not to sell the Property to Ridgeline and the

reasons MidCap did not sell; and

(d)     the gross and net income derived by MidCap from any lease on the

Property entered into after the foreclosure on November 7, 2017.

6.

With respect to each individual identified in Interrogatory Response No. 5,

identify the basis of his or her knowledge and identify all documents evidencing or

reflecting any of the information provided in MidCap's response.

7.

To the extent MidCap contends that the Commitment is not binding or

enforceable:

(a)     state all facts that support this contention;

(b)    identify all persons whom you know or have any reason to believe have any knowledge relating to the information provided in subparagraph (a); and

(c)    identify all documents evidencing, reflecting, or referring to any information provided in response to subparagraph (a).

8.

(a)    Identify all reasons MidCap did not sell the Property to Ridgeline;

(b)    identify all persons whom you know or have any reason to believe have any knowledge relating to the information provided in paragraph (a); and

(c)    identify all documents evidencing, reflecting, or referring to any information provided in response to paragraph (a).

9.

(a)    Identify all reasons why MidCap did not return Ridgeline's $50,000 good faith deposit;

(b)    identify all persons whom you know or have any reason to believe have any knowledge relating to the information provided in paragraph (a); and

(c)    identify all documents evidencing, reflecting, or referring to any information provided in response to paragraph (a).

10.

To the extent your responses to Ridgeline's First Requests for Admissions
are anything other than unqualified admissions, identify specifically the portions of
each Request that cannot be admitted and state all facts and identify all documents
supporting your position that the Request cannot be admitted without qualification.

Respectfully submitted this 21st day of February, 2018.

Jeffrey D. Horst
Georgia Bar No. 367834
Christopher E. Adams
Georgia Bar No. 789600
*Attorneys for Plaintiff*

KREVOLIN & HORST, LLC
One Atlantic Center, Suite 3250
1201 West Peachtree St., N.W.
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the within and foregoing *Plaintiff Ridgeline Capital Partners, LLC's First Interrogatories to Defendant Midcap Financial Services, LLC* were served on Defendant via courier to insure hand delivery to:

MidCap Financial Services, LLC
c/o C T CORPORATION SYSTEM
289 S Culver St.
Lawrenceville, GA 30046-4805

This 21st day of February, 2018.

KREVOLIN & HORST, LLC

Jeffrey D. Horst
Georgia Bar No. 367834
Christopher E. Adams
Georgia Bar No. 789600
*Attorneys for Plaintiff*

1201 W. Peachtree Street, N.W.,
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **RIDGELINE CAPITAL PARTNERS, LLC,** | ) ) ) | |
| **Plaintiff,** | ) ) | **CIVIL ACTION FILE NO.** |
| **v.** | ) ) ) | _____ |
| **MIDCAP FINANCIAL SERVICES, LLC,** | ) ) ) | |
| **Defendant.** | ) ) ) | |

## PLAINTIFF RIDGELINE CAPITAL PARTNERS, LLC'S FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT MIDCAP FINANCIAL SERVICES, LLC

Pursuant to O.C.G.A. §§ 9-11-26 and 9-11-34, Plaintiff Ridgeline Capital

Partners, LLC ("Ridgeline") hereby propounds its First Requests for Production of

Documents ("Requests") to Defendant MidCap Financial Services, LLC

("MidCap"). These Requests are to be answered in writing under oath within the

applicable time period prescribed by Georgia law.

### DEFINITIONS

(a)    <u>Plaintiff or Ridgeline</u> – As used herein, "Plaintiff" or "Ridgeline"

shall refer to Ridgeline Capital Partners, LLC and all of its parents, subsidiaries,

affiliated entities, directors, officers, members, managers, agents, employees,

representatives, independent contractors, and attorneys.

1

    (b)    <u>Defendant or MidCap</u> – As used herein, "Defendant" or "MidCap" refers to MidCap Financial Services, LLC, all of its parents, subsidiaries or affiliated entities, including, but not limited to Apollo Global Management, LLC, and all directors, officers, members, managers, agents, employees, representatives, independent contractors, and attorneys.

    (c)    <u>Document/Records</u> - As used herein, the word "document(s)" or "record(s)" is intended to include and shall include, without limitation and in the singular as well as in the plural, any stored or retained data or information in any form, including but not limited to hard copies, digital, electronic or magnetic retained information.  Such documents include and are not limited to drafts and final versions of all memoranda (including written memoranda of telephone conversations, other oral communications, discussions, agreements, acts and activities), letters, postcards, telegrams, intra-office and inter-office communications, pamphlets, diaries, records of every kind, email, email attachments, computer diskettes, CD ROMs, internal or external hard drives, computer tapes, sound recordings, transcripts of sound recordings, contracts, books, reports, catalogs, price lists, financial statements, books of account, journals, ledgers, purchase orders, invoices, indices, computer programs and data, data files, tapes, correspondence, document changes not saved, documents created not saved, instant messages-sent and received, metadata, internet service provider

emails, voice mail messages/deleted voice messages, folder name/file directory,

master file table, images-including all website images visited, all website visiting

activities-including elapsed time while viewing each site, spreadsheets, database

files, financial records including tax and accounting information, faxes sent and

received, files access history from company servers and/or internet, contact lists,

outlook calendar appointments, PDA synchronized data, history of internet

searches by search criteria, blogs, company records, inventory of all external

hardware devices connected to computers (*e.g.*, external media devices, printers,

backup systems, jump drives, etc.), inventory of all software applications installed

on the computers, deleted data files, photographs, microfilm, bulletins, circulars,

notices, surveys, minutes, instructions, canceled checks, calendars, drawings,

diagrams, sketches, and writings of every kind and character, including preliminary

drafts and other copies of the foregoing, however produced or reproduced.

(d)    <u>Person</u> – As used herein, "person" shall mean a natural person or an

artificial person, including partnerships, corporations, proprietorships,

unincorporated associations, limited liability entities, governmental bodies, or any

other legally cognizable entities.

(e)    <u>Date</u> – As used herein, "date" shall mean the exact day, month, and

year, if known to the respondent, or, if the exact date is not known, the best

available approximation.

(f)    <u>Communication</u> – As used herein, "Communication" refers to any manner or form of information, memoranda, notes or message transmission, however produced or reproduced, whether by "document," as herein defined or orally or otherwise, which is made by you or others or which is distributed or circulated between or among persons, or data storage or processing units including computer data storage and processing units, and any and all documents containing, consisting of, or relating or referring, in any way, either directly or indirectly to, a communication.

(g)    <u>State all facts</u> – As used herein, the term "state all facts" shall mean to state all facts discoverable under O.C.G.A. §§ 9-11-26 and 9-11-33 known to MidCap or MidCap's attorney, and to identify all persons having knowledge of such facts, identify all documents concerning or relating to such facts, and identify all communications concerning or relating to such facts.  When used in reference to any allegation of the pleadings, "state all facts" shall include all facts negating, as well as supporting the allegation.

(h)    <u>Identify and give the identity of</u> – As used herein, "identify" or to give the "identity of" when used in reference to:

(1)    A person who is an <u>individual</u>, shall mean to state its or her full name, present or last known residence address (designating which), and present or

last known position or business affiliation (designating which), job title,

employment address, and business and residence telephone numbers;

(2)    A person who is a <u>firm, partnership, corporation, proprietorship,</u>

<u>association, financial institution, or other organization or entity,</u> shall mean

to state its full name and present or last known address and telephone

number (designating which), the legal form of such entity or organization,

and the identity of its chief executive officer;

(3)    A <u>document</u> shall mean to state the title (if any), the date, author,

sender, recipient, the identity of persons signing it, type of document (i.e.,

letter, memorandum, book, telegram, invoice, etc.) or some other more

particular means of identifying it if known (*e.g.*, invoice number), the names

of the persons known to have seen the document or to have received copies,

its present location or custodian, and a description of its contents (in lieu of

stating the foregoing information, MidCap may attach a legible copy of a

document to the responses hereto, specifying the particular Interrogatory to

which the copy is in response and identifying the present custodian of the

original); and

(4)    An <u>oral communication</u> shall mean to state the date, subject matter,

communicator, communicatee, nature of communication, place or places

where the communication occurred, whether it was recorded or otherwise memorialized, and identity of any witnesses thereto.

(i)     Relating to – As used herein, the term "relating to" shall mean having any relationship or connection to, concerning, being connected to, commenting on, responding to, containing, evidencing, showing, memorializing, describing, analyzing, reflecting, pertaining to, comprising, constituting, or otherwise establishing any reasonable, logical, or causal connection.

(j)     Complaint – As used herein, "Complaint" shall refer to the Complaint filed by Ridgeline Capital Partners, LLC in the above-styled case.

(k)     You or Your - As used herein, "you" or "your" refers to the Defendant as defined herein.

(l)     Commitment - As used herein, the "Commitment" refers to the November 9, 2017 letter from MidCap to Ridgeline which was signed and accepted by Ridgeline on November 13, 2017.

(m)     Property – As used herein, the "Property" refers to Governors Pavilion, a 45,331 sq. ft. medical office building located at 4450 Calibre Crossing NW, Acworth, Georgia.

(n)     Defaulting Borrower – As used herein, the "Defaulting Borrower" refers to the owner of the Property prior to the November 7, 2017 foreclosure.

(o)     Answer – As used herein, "Answer" shall refer to the Answer filed by MidCap Financial Services, LLC in response to the Complaint in the above-styled case.

## INSTRUCTIONS

(a)     Please reproduce each Interrogatory and set forth the answer to each Interrogatory separately.  When these Interrogatories contain separately numbered or lettered paragraphs, each separately numbered or lettered paragraph should be treated separately and a separate response furnished.

(b)     Objections Based on Privilege – In the event that any answers or identification of any documents requested herein are withheld under a claim of privilege, please provide the following information with respect to each such answer or document:

(1)     The type of document, its general subject matter, and the place and approximate date it was prepared or created;

(2)     The name and title of each person who prepared or created the document or who has knowledge of the answer, and the name and title of each other person who has received or examined the document or a copy thereof;

(3)     A statement of the circumstances which bear on whether or not the claim of privilege is appropriate and whether the privilege that is claimed

should extend to the entire answer or document or to part of the answer or document; and

(4)     The number of each Interrogatory to which the answer or document otherwise would be responsive.

(c)     To the extent any information called for by these Interrogatories is unknown to MidCap, so state, and set forth such remaining information as is known.  If any estimate can reasonably be made in place of unknown information, also set forth MidCap's best estimate, clearly designated as such, in place of unknown information, and describe the basis upon which the estimate is made.

(d)     <u>Documents No Longer in MidCap's Possession</u> – If any document which MidCap would have produced in response to any Interrogatory was, but is no longer, in MidCap's present possession or subject to MidCap's control or is no longer in existence, please state whether any such document is:

(1)     missing or lost;

(2)     destroyed;

(3)     transferred to others; or

(4)     otherwise disposed of, and in any such instance, set forth the surrounding circumstances of any authorization for such disposition and state the approximate date of any such disposition, and, if known, state also the present location and custodian of such document.

(e)     These Interrogatories shall be deemed continuing, so as to require additional answers if further information is obtained between the time the answers are served and the time of the trial.  Such additional answers shall be served from time to time, but not later than seven (7) days after such additional information is received or ten (10) days prior to hearing or a trial of tits action, whichever period is sooner.

(f)     Should it be more convenient to produce copies of relevant documents instead of identifying and stating the contents of those documents when that is requested, MidCap may produce true and correct copies of any such documents, including drafts of other variations therefrom, in lieu of supplying the identification requested above, arranged and labeled separately for each answer to which they relate.

(g)     Unless otherwise noted, the applicable time period for these Interrogatories is January 1, 2017 to the date of your responses.

## REQUESTS FOR PRODUCTION

1.

All documents identified or referred to in MidCap's answers to Ridgeline's First Interrogatories.

KH475897.DOCX 4                            9

**2.**

All documents relied on or used by MidCap to prepare its answers to Ridgeline's First Interrogatories.

**3.**

All documents relied on or used by MidCap to prepare its answers to Ridgeline's Requests for Admission.

**4.**

All documents relating to this case provided to any consultant or expert.

**5.**

All documents prepared by any expert or consultant relating to this case.

**6.**

All documents or other communications between any expert or consultant and MidCap or MidCap's counsel relating to this case.

**7.**

All documents upon which any expert MidCap expects to call at the trial of this case intends to rely upon or refer to.

**8.**

All documents supporting MidCap's denial of the allegations of Ridgeline's Complaint.

9.

All documents reflecting or relating to any reason MidCap has refused to sell the Property to Ridgeline.

10.

All documents reflecting or relating to the reasons MidCap did not return Ridgeline's $50,000 good faith deposit.

11.

All documents that support MidCap's affirmative defenses.

12.

All documents reflecting the gross or net revenue or profit from any leases on the Property signed after November 7, 2017.

13.

All documents, including but not limited to communications between Lawrence Brin and any officer, employee, manager, consultant, client, or agent of MidCap, that discusses, refers, or relates to: (a) the Property; (b) the foreclosure on the Property; (c) Ridgeline's potential purchase of the Property; (d) leasing the Property; (e) any financing terms MidCap offered to Ridgeline to purchase the Property; (f) Ridgeline's $50,000 good faith deposit; or (g) reimbursing Ridgeline for any due diligence expenses or other losses.

14.

All documents that refer, reflect, or relate to any actual or potential contract, agreement, negotiation, or understanding between MidCap and Ridgeline.

15.

All documents reflecting, referring, or relating to financial impact on MidCap from leasing the Property rather than selling it to Ridgeline.

16.

All documents reflecting, referring, or relating to any communications between Ridgeline and MidCap.

17.

All documents reflecting, referring, or relating to any communications between Lawrence Brin and Jeff Axley.

18.

All leases signed for the Property after November 7, 2017.

19.

All documents reflecting, referring, or relating to any communication with any actual or potential tenant or lessee of the Property.

20.

All documents referring or relating to the Commitment.

21.

All documents reflecting any communications between MidCap and any other entity or person referring or relating to: (1) any of the facts alleged in Ridgeline's Complaint; (2) MidCap's Answer and Defenses; (3) the foreclosure of the Property; (4) the Commitment; or (5) leasing the Property.

22.

All files MidCap maintains on Ridgeline.

23.

All documents or records reflecting, referring, or relating to the financial performance of the Property.

24.

All documents reflecting, referring, or relating to the letter that MidCap sent Ridgeline on or around November 9, 2017. (*See* attachment to Exhibit B of Ridgeline's Complaint).

25.

All documents reflecting, referring, or relating to any internal communications of MidCap referring or relating to this litigation or Ridgeline.

26.

All written statements and/or affidavits taken from any person in connection with this litigation.

27.

All documents referring or relating to any statements taken from any person in this case.

28.

All drafts of affidavits or written statements prepared for this litigation.

29.

All tape recordings of any meetings, discussions, or conversations that refer or relate to MidCap.

30.

All tape recordings of any meetings, discussions, or conversations between Ridgeline and MidCap.

31.

All minutes, notes, or other documents reflecting or relating to any formal or informal meeting of the board of directors, or any of the officers, members, or managers of MidCap, relating to Ridgeline, the Property, the foreclosure on the Property, the sale or leasing of the Property, or this lawsuit.

32.

All valuations and appraisals of the Property.

33.

All documents MidCap has received from any person not a party to this case

relating to Ridgeline or the facts and issues involved in this case.

34.

For each of the foregoing document requests that seek production of

MidCap's information which is stored on computer tapes, disks, hard drive, etc.

produce any such computer tapes, disks, hard drive, etc. containing the material

and the formats to enable Ridgeline to read such computer data.

Respectfully submitted this 21st day of February, 2018.

Jeffrey D. Horst
Georgia Bar No. 367834
Christopher E. Adams
Georgia Bar No. 789600
*Attorneys for Plaintiff*

KREVOLIN & HORST, LLC
One Atlantic Center, Suite 3250
1201 West Peachtree St., N.W.
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the within and foregoing *Plaintiff Ridgeline Capital Partners, LLC's First Requests for Production of Documents to Defendant Midcap Financial Services, LLC* were served on Defendant via courier to insure hand delivery to:

MidCap Financial Services, LLC
c/o C T CORPORATION SYSTEM
289 S Culver St.
Lawrenceville, GA 30046-4805

This 21st day of February, 2018.

KREVOLIN & HORST, LLC

Jeffrey D. Horst
Georgia Bar No. 367834
Christopher E. Adams
Georgia Bar No. 789600
*Attorneys for Plaintiff*

1201 W. Peachtree Street, N.W.,
Suite 3250, One Atlantic Center
Atlanta, GA 30309
(404) 888-9700
(404) 888-9577 (facsimile)

KH475897.DOCX 4                    16

**IN THE SUPERIOR COURT OF GWINNETT COUNTY**
**STATE OF GEORGIA**

FILED IN OFFICE
~~SUPERIOR COURT~~
GWINNETT COUNTY, GA

2018 FEB 20  PM 4: 30

RICHARD ALEXANDER, CLERK

| | |
|---|---|
| RIDGELINE CAPITAL PARTNERS, LLC | ) |
| Plaintiff, | ) |
| v. | ) |
| MIDCAP FINANCIAL SERVICES, LLC | ) |
| Defendant. | ) |

CIVIL ACTION FILE NO.
**78 A   0 15 2 8** - **10**

## ORDER GRANTING MOTION FOR
## APPOINTMENT OF A SPECIAL PROCESS SERVER

Upon consideration of Plaintiff's Motion for Appointment of a Process Server, and in consideration of applicable law;

IT IS HEREBY ORDERED AND ADJUDGED THAT John Fox is hereby specially appointed for service of a copy of the Summons and Complaint in the above-referenced action upon the Defendant MidCap Financial Services, LLC.

So Ordered this *20* day of February 2018.

_____
SUPERIOR COURT JUDGE *Warren Davis*
GWINNETT COUNTY

**AFFIDAVIT OF SERVICE SHALL**
**LIST ALL DOCUMENTS SERVED**